WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Ndapewa Deborah Shaninga, | No. CV-14-02475-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| St. Luke's Medical Center LP, et al., | |
| Defendants. | |

Pending before the Court is Defendants' St. Luke's Medical Center LP, IASIS Healthcare Holdings, Inc., and IASIS Healthcare Corporation's Motion for Summary Judgment (collectively "SLMC") (Doc. 72).  For the following reasons the Court grants the motion.

## BACKGROUND

Plaintiff Ndapewa Deborah Shaninga ("Shaninga") is black and is from South Africa.  Plaintiff's Statement of Facts ("PSOF") ¶ 80.  Shaninga holds a bachelor's degree in nursing as well as an MBA.  PSOF ¶ 81.

On February 11, 2013, SLMC's Director of Education Mona Smith ("Smith") and Administrator of Cardiovascular Services Stuart Scherger ("Scherger") hired Shaninga as an RN in the telemetry department.  DSOF ¶ 8.  Over the ten months Shaninga worked at SLMC, she engaged in at least 237 hours of orientation and training.  DSOF ¶ 24.  Shaninga contends, however, that other comparable non-black nurses received more

orientation and training over the same time-period.  PSOF ¶ 24, Ex. 1 ¶¶ 21–25.  Also, during "Nurses Week," while other non-black nurses received two pairs of scrubs, Shaninga received only one.  PSOF ¶ 86.

Throughout February 2013, Shaninga signed various forms and checklists acknowledging her competency in certain critical nursing skills and behaviors.  DSOF ¶¶ 25–30.  Shaninga and her preceptor Tammy Ericson also completed forms assessing Shaninga's competency in "Initial Patient Care," rating her "competent" and able to "perform independently" in 111 different skills and abilities.  DSOF ¶ 31.  Ericson also independently completed an "Ongoing Competency Assessment & Evaluation" form in which she rated Shaninga "superior" or "satisfactory" in all measured areas.  DSOF ¶ 33; Doc. 72, Ex. 1 at 299:21–300:15.

Not long after starting at SLMC, Shaninga testified that a non-black secretary in the telemetry department named "Debbie" refused to call Shaninga by the name she displayed on her SLMC badge: "Deborah."  PSOF ¶ 82, Ex. 1 ¶¶ 8–9.  The secretary asked for Shaninga's "real name" and would get upset if Shaninga responded to someone calling for "Debbie," although people referred to Shaninga as "Debbie" regularly.  PSOF ¶ 82, Ex. 1 ¶¶ 10–11.  On another occasion, a non-black surgeon at SLMC, after calling for "Deborah" regarding a patient Shaninga worked on, walked away and "refused to speak" to Shaninga after she answered his call and he responded "are YOU Deborah?"  PSOF ¶ 83, Ex. 1 ¶¶ 12–14.  Shaninga believed her race motivated the conduct of both persons in these incidents.  Doc. 72, Ex. 1 at 329:18–337:10.

Clinical Nurse Manager Reshma Maharaj ("Maharaj") supervised Shaninga while she worked in SLMC's telemetry department.  DSOF ¶ 38.  On April 12, 2013, Clinical Coordinator Ampili Umayamma emailed Maharaj to report that Shaninga had been involved in a heated disagreement with another SLMC employee in front of a patient.  DSOF ¶ 49.  Shaninga concedes that Umayamma sent the email, but she denies its description of the incident.  PSOF ¶ 49.

On May 7, 2013, SLMC security officers Fenel Lafleur and Brian Rhodes reported

to Smith that they witnessed Shaninga in a second altercation with another SLMC employee—Karla Rivas ("Rivas")—that involved another heated exchange in the presence of a patient.  DSOF ¶ 50.  Shaninga admits that such an incident was reported, however, she denies the details of the incident.  PSOF ¶ 50.  Shaninga claims that she "interrupted a violation of hospital policy, and possibly state law, by stopping [Rivas from administering] a four-point restraint on an African-American patient under her care . . . ."  PSOF ¶ 92.  Shaninga reprimanded Rivas, who abandoned Shaninga with the patient and complained to Smith.  PSOF ¶¶ 93–94.

Also on May 7, 2013, Shaninga emailed a complaint to Maharaj that described at least two "situations" regarding how other nurses and SLMC employees treated Shaninga.  Doc. 72, Ex. 1, Ex.121.  The complaint consisted mostly of issues with how other nurses and nursing assistants performed their duties; however, Shaninga also referenced situations possibly involving her race, for example, once when an SLMC employee informed her that a certain secretary had "problems with black people" or another incident where Shaninga heard SLMC staff members mocking her English language skills.  PSOF ¶ 67, Ex. 1-1; Doc. 72, Ex. C ¶ 11.  Maharaj informed Shaninga on May 8, 2013 that she would look into each "situation" and would schedule a time for the two of them to meet.  PSOF ¶ 67, Ex. 1-1.  Maharaj investigated Shaninga's concerns by "reviewing her assignments and interviewing the charge nurses" and she determined that Shaninga's work assignments were fair, which she relayed to Shaninga.  Doc. 72, Ex. C ¶ 12, Ex. 4.  Shaninga disputes that Maharaj reasonably investigated the reported incidents.  PSOF ¶ 62.

On May 16, 2013, Maharaj and Scherger met with Shaninga to review her ninety-day performance evaluation.  Doc. 72, Ex. C ¶ 17.  Maharaj rated Shaninga "above average" in the categories of quality of work, quantity of work, ability to learn, and initiative, while she rated Shaninga "satisfactory" in the categories of attitude and attendance.  Doc. 72, Ex. C ¶ 17, Ex. 8.  Shaninga also received a verbal warning for unprofessional behavior due to the chronicled incident with Rivas.  DSOF ¶¶ 51–52.  On

May 19, 2013, Shaninga received, but refused to sign, the performance management program ("PNP") record of conference document related to the incident with Rivas.[1] Doc. 72, Ex. C ¶ 18, Ex. 9.  Instead, Shaninga emailed Maharaj and requested to be taken "off the schedule for now because I have to clear my name."[2]  Doc. 72, Ex. C ¶ 18, Ex. 9.

On May 20, 2013, Scherger emailed SLMC's Director of Human Resources Trinise Thompson ("Thompson") and summarized the May 16 meeting with Shaninga. Doc. 72, Ex. C ¶ 19, Ex. 10.  In it, Scherger recounted Maharaj's review of Shaninga's complaints included in her May 7 email.  Doc. 72, Ex. C ¶ 19, Ex. 10.  He also discussed the incident with Rivas and Shaninga's refusal to sign the PNP.  Doc. 72, Ex. C ¶ 19, Ex. 10.  Finally, he explained that at the meeting's conclusion, all of the parties agreed that Shaninga would return to work on May 20.  Doc. 72, Ex. C ¶ 19, Ex. 10.

On May 30, 2013, Shaninga requested a low patient census (otherwise referred to as "LCD" in SLMC's documentation)[3] for May 31 in an effort to take that day off.  Doc. 72, Ex. D ¶ 24.  SLMC denied her request; nonetheless, Shaninga did not show up for her shift resulting in a "no call/no show" on her timesheet.  Doc. 72, Ex. D ¶ 24.

On May 31, 2013, Scherger emailed Thompson and asked the HR department "to review [Shaninga's] files for consideration of continued employment, due to the number of [attendance and behavioral] issues presented in her first 4 months as an employee [*i.e.*, Shaninga's probationary period]."  Doc. 72, Ex. D ¶ 25, Ex. 6.  The request stemmed "solely" from Shaninga's attendance and behavioral issues.  Doc. 72, Ex. F ¶ 30. Thompson responded with three termination options.  Doc. 72, Ex. F ¶ 30, Ex. 13.  One option raised the concern that Shaninga may file a retaliation claim since Shaninga had already filed a grievance (raising work related issues but not yet discrimination) with

---

[1] Rivas also received a written warning for her unprofessional conduct, however, SLMC did not cite Rivas for her actions until June 23, 2013—a month after Shaninga received her reprimand.  PSOF ¶ 54.

[2] Eventually, on July 1, 2013, Shaninga submitted a three-page email providing her own account of the incident with Rivas.  DSOF ¶ 53.

[3] LCD occurs when the patient to staff ratio is low enough that some nurses or other employees are asked to stay home from work.  PSOF, Ex. 1 ¶ 91.

SLMC.   Doc. 72, Ex. F ¶ 31.   Scherber forwarded Thompson's proposed options to Smith, but SLMC took no action.  Doc. 72, Ex. F ¶ 30, Ex. 13.

On June 26, 2013, Shaninga emailed Maharaj and raised the issue of race discrimination at SLMC.  Doc. 72, Ex. C ¶¶ 20–21, Ex. 11.  Shaninga suggested that it was because she was "the only black full time nurse on days" that her co-workers treated her negatively.  Doc. 72, Ex. C ¶ 20, Ex. 11.  Shaninga also accused SLMC of turning a blind eye to the improper actions of Shaninga's co-workers since "[t]he perpetrator[s were] not black."  Doc. 72, Ex. C ¶ 20, Ex. 11.  Shaninga further alleged retaliation from her May 7 complaint, arguing that while her shifts "haven't been cancelled unfairly . . . [her] assignment has been overloaded."  Doc. 72, Ex. C ¶ 20, Ex. 11.  Maharaj forwarded the email to the HR department who eventually forwarded the email to Thompson.  Doc. 72, Ex. F ¶ 32.

Thompson, in response, personally began investigating Shaninga's allegations of discrimination including interviewing employees in the telemetry department.  Doc. 72, Ex. F ¶ 33.  None of the nurses Thompson interviewed, as evidenced by Thompson's interview notes, raised any issues related to discrimination in the telemetry department.  Doc. 72, Ex. F ¶ 33, Ex. 15.  In addition to her personal interviews, Thompson also considered an in-depth summary drafted by Maharaj outlining the history of her interactions with Shaninga since Shaninga began in the telemetry department.  Doc. 72, Ex. F ¶ 36, Ex. 16; Doc. 72, Ex. C ¶ 23, Ex. 13.  At no point did Thompson or any other individual from SLMC follow-up with Shaninga personally as part of its investigation of her allegations of discrimination.  PSOF ¶ 67, Ex. 1 ¶ 69.

Thompson reported back to Maharaj that her investigation uncovered no corroborating evidence of Shaninga's claims of discrimination.  Doc. 72, Ex. C ¶ 24.  Maharaj then attempted to set up an in-person meeting with Shaninga to discuss her allegations, but Shaninga declined and instead requested that SLMC's response be in a letter.   Doc. 72, Ex. C ¶ 24, Ex. 14.   After consulting with Thompson and Smith regarding the contents of the correspondence, Maharaj sent Shaninga a letter on July 16,

2013 explaining that after investigating her claims of discrimination, the HR department "found no verification of discriminatory practices." Doc. 72, Ex. C ¶ 26, Ex. 16.

After her May 7 and June 26 complaints, Shaninga alleges that she began to encounter increased "push backs" and LCD cancellations to her schedule. PSOF ¶¶ 108–109. Furthermore, although SLMC would push back her shifts, it concurrently utilized "pool" and outside agency nurses—nurses normally only called in when SLMC failed to find a full-time nurse to work a shift. PSOF ¶¶ 110–113. Shaninga claims SLMC's conduct was retaliatory. PSOF ¶ 113.

On July 29, 2013, Shaninga received a verbal warning due to five "occurrences," *i.e.*, absences or "no call/no shows," under SLMC's attendance policy. DSOF ¶¶ 57–58; Doc. 72, Ex. F, Ex. 22. That same day Shaninga also submitted an application for transfer seeking a position in the Tempe SLMC's intensive care unit ("ICU"). DSOF ¶ 39. Smith approved her application and she started working in the ICU on August 4, 2013. DSOF ¶ 40; Doc. 72, Ex. E ¶ 35. Shaninga claims that Smith took a more direct role in controlling her schedule and work environment after the transfer. PSOF ¶ 115. At the ICU, Jesse Sharrock ("Sharrock") became Shaninga's new supervisor. Doc. 72, Ex. 1 at 347:15–20.

Around the time of her transfer, Shaninga requested orientation at the ICU. PSOF ¶ 117. SLMC scheduled orientation from August 2–4, 2013, however, Smith cancelled the first two orientation days and the ICU was closed on the third. PSOF ¶ 117. Shaninga attempted to re-schedule her orientation, but Shaninga states that Smith and various ICU nurses and staff prevented her from doing so. PSOF ¶¶ 118–121. Eventually, on August 6, 2013, ICU staff told Shaninga that she could not work until she received an updated TB skin health screening since her previous one had expired that day. PSOF ¶ 122. Shaninga claims that SLMC failed to notify her of the impending expiration of her TB skin health screening, and normal procedures ensure that nurses are notified in order for them remain in compliance. PSOF ¶ 123. Shaninga received a TB skin health screening and started back at work by August 13, 2013. PSOF ¶ 126.

1        On September 27, 2013, Sharrock verbally counseled Shaninga on SLMC's
2   attendance policy stemming from an incident in which Shaninga failed to show up for her
3   shift after first having her shift pushed back several hours.  DSOF ¶ 59; Doc. 72, Ex. 1 at
4   350:15–355:16, Ex. 128.  Shaninga concedes that she received the counseling, but she
5   contests the appropriateness of the counseling since, according to her, she missed her
6   shift because the ICU indicated that they would contact her by 9:00 p.m. to let her know
7   whether she needed to come in that night.  PSOF ¶ 59; Doc. 72, Ex. 1 at 350:15–352:7.
8   When she did not hear from them by that time, she fell asleep and missed their calls later
9   in the evening.  PSOF ¶ 59; Doc. 72, Ex. 1 at 350:15–352:7.  Shaninga refused to sign the
10  related PNP document.  Doc. 72, Ex. 1, Ex. 128.

11       On October 8, 2013, Shaninga received another written counseling from Sharrock,
12  this time related to Shaninga's "7 call offs in a rolling 12 month period ending on
13  October 7, 2013 [that] indicate chronic absenteeism and violation of" SLMC's attendance
14  policy.[4]   DSOF ¶ 60; Doc. 72, Ex. 1, Ex. 129.  Shaninga admits to receiving the
15  counseling, although she disagrees that such counseling was appropriate.  PSOF ¶ 60.
16  Shaninga again refused to sign the related PNP document.  Doc. 72, Ex. 1, Ex. 129.

17       On October 29, 2013, Sharrock reported to Smith and the Director of Quality and
18  Risk Management Rejeanna Hunter ("Hunter") that Shaninga had improperly
19  administered a total parenteral nutrition ("TPN") bag to a patient whom the treating
20  physician had ordered to be taken off the therapy and then defaced the label of the bag to
21  cover up the error.  DSOF ¶ 70.  The original intended recipient of the TPN bag, as a
22  result, went without his therapy.  Doc. 72, Ex. E ¶ 38.  As described to Sharrock from
23  Nolan Jenkins ("Jenkins"), a nurse in the ICU, during the morning shift change, Shaninga
24  informed Jenkins that the patient's treating physician had discontinued the TPN bag, but
25  because a new TPN bag had already been prepared, she hung it anyway so it would not
26  go to waste.  Doc. 72, Ex. B ¶ 8.  Jenkins discovered that in fact the newly prepared bag

27  ───────────────

28      [4] Call offs are equivalent to unscheduled absences defined as an absence not
    requested and approved 24 hours in advance.  Doc. 72, Ex. 1, Ex. 129.

was intended for a different patient entirely, and someone, presumably Shaninga, altered the bag's label in an attempt to obscure the different name.  Doc. 72, Ex. B ¶ 9.  Hunter testified to personally observing the defaced label herself.  Doc. 72, Ex. B ¶ 10.  The treating physician's notes, moreover, reflected his or her order to discontinue the TPN bag on October 28, 2013.  Doc. 72, Ex. B ¶ 11, Ex. 1.  And an electronic record entered by Shaninga on the morning of October 29, 2013 indicated that she hung a TPN bag. Doc. 72, Ex. B ¶ 12, Ex. 2.

Shaninga denies that the incident ever occurred.  PSOF ¶ 70.  Nonetheless, in accordance with SLMC procedure, Hunter initiated an investigation into the medication error.  Doc. 72, Ex. B ¶ 20.  Eventually, after previous attempts to meet with Shaninga failed, Hunter, Smith, Sharrock, and Chief Nursing Officer Michael Polite ("Polite") met with Shaninga regarding the error on November 1, 2013.  Doc. 72, Ex. B ¶ 15.  Hunter's report of the meeting reflects that Shaninga admitted to hanging the TPN bag for a patient despite knowing that the treating physician had discontinued the therapy and it was intended for a different patient.  Doc. 72, Ex. B ¶¶ 16, 20, Ex. 3.  In the meeting, Shaninga initially dismissed the mistake stating "well nobody died, right?" and then excused her behavior on religious grounds stating that her beliefs did "not allow [her] to participate in withdrawal of care."[5]  Doc. 72, Ex. B ¶ 20, Ex. 3.  Shaninga also expressed that she often found errors in the work of other ICU staff yet she did not report them, and that she believed SLMC was targeting her personally.[6]  Doc. 72, Ex. B ¶ 20, Ex. 3.

After the interview concluded, Hunter, Smith, Sharrock, and Polite determined that Shaninga should be terminated.  Doc. 72, Ex. B ¶ 20, Ex. 3.  Smith terminated Shaninga's employment effective November 4, 2013 for "practice outside the scope of nursing, willingly, knowingly."  Doc. 72, Ex. E ¶ 56, Ex. 13.  Hunter also filed a

---

[5] The patient at issue was in the process of being moved from the ICU to hospice care.  PSOF, Ex. 1 ¶ 137.

[6] Shaninga asserts that Erick Fischer, the non-black charge nurse who instructed Shaninga on the administration of the TPN bag at the heart of the October 29, 2013 incident, received no reprimand from SLMC.  PSOF ¶¶ 145, 154.

1    complaint against Shaninga to the Arizona Board of Nursing due to the alleged TPN

2    error.  Doc. 72, Ex. B ¶ 22.  IASIS Vice President of Human Resources Lloyd Price

3    approved the decision to end Shaninga's employment and to report her to the Board of

4    Nursing after being informed of the TPN error.  Doc. 72, Ex. F ¶ 40, Ex. 20.  No member

5    of SLMC ever directly stated that race, a prior complaint, or retaliation motivated

6    SLMC's decision to terminate Shaninga.  DSOF ¶¶ 76–79.

7        Soon after her termination, Shaninga filed a grievance with the Arizona Board of

8    Nursing dated November 3, 2013.  Doc. 72, Ex. F ¶ 41, Ex. 21.  The grievance explained

9    Shaninga's side of the story related to the TPN error and also generally described the

10   hostility, harassment, and discrimination she allegedly experienced while at SLMC.  Doc.

11   72, Ex. F ¶ 41, Ex. 21.  Through the grievance, however, Shaninga also admitted to

12   "hang[ing] the only bag in the refrigerator," but explained that while "mistakes happen"

13   SLMC reprimanded her more harshly than other nurses who have also committed errors.

14   Doc. 72, Ex. F ¶ 41, Ex. 21.

**DISCUSSION**

16   **I.    Legal Standard**

17       Summary judgment is appropriate if the evidence, viewed in the light most

18   favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to

19   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

20   P. 56(a).  Substantive law determines which facts are material and "[o]nly disputes over

21   facts that might affect the outcome of the suit under the governing law will properly

22   preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

23   242, 248 (1986).  "A fact issue is genuine 'if the evidence is such that a reasonable jury

24   could return a verdict for the nonmoving party.'"  *Villiarimo v. Aloha Island Air, Inc.*,

25   281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson,* 477 U.S. at 248).  Thus, the

26   nonmoving party must show that the genuine factual issues "'can be resolved only by a

27   finder of fact because they may reasonably be resolved in favor of either party.'"  *Cal.*

28   *Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th

Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

Although "[t]he evidence of [the non-moving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor," the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations unsupported by facts.  *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c).  "A trial court can only consider admissible evidence in ruling on a motion for summary judgment," and evidence must be authenticated before it can be considered.  *Orr v. Bank of Am.*, 285 F.3d 764, 773–74 (9th Cir. 2002).

## II.    Analysis

Shaninga raises racial discrimination, retaliation, and hostile work environment claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Arizona Civil Rights Act ("ACRA"), § 14-1461 *et seq.*, and 42 U.S.C. § 1981.  The Ninth Circuit recognizes that the ACRA is "generally identical to Title VII, and therefore federal Title VII case law is persuasive in the interpretation of the [ACRA]."  *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 742 (9th Cir. 2004) (internal quotation marks, citation, and modifications omitted).  Likewise, "[a]nalysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case."  *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004).  Consequently, the Court's analysis will follow the framework applicable to Title VII but will apply equally to Shaninga's ACRA and § 1981 claims.

/ / /

/ / /

1        **A.     Disparate Treatment**

2        "Disparate treatment claims must proceed along the lines of the praxis laid out by

3    the Supreme Court" in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and its

4    progeny.  *Bodett*, 366 F.3d at 743.  A discrimination plaintiff must first establish a *prima*

5    *facie* case of disparate treatment.  If the plaintiff successfully makes such a showing, the

6    burden then shifts to the defendant to produce some evidence demonstrating a legitimate,

7    nondiscriminatory reason for the plaintiff's termination.  *McDonnell Douglas*, 411 U.S.

8    at 802.  Upon the defendant meeting this burden of production, any presumption that the

9    defendant discriminated against the plaintiff "drops from the case," and the burden shifts

10   back to the plaintiff who must then show that the defendant's alleged reason for

11   termination was merely a pretext for discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509

12   U.S. 502, 507–08 (1993).

13       The plaintiff "may prove pretext either directly by persuading the court that a

14   discriminatory reason more likely motivated the [defendant] or indirectly by showing that

15   the [defendant's] proffered explanation is unworthy of credence."  *Raad v. Fairbanks N.*

16   *Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003) (quoting *Texas Dep't of*

17   *Comm. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  "The evidence proffered can be

18   circumstantial or direct."  *Bodett*, 366 F.3d at 743 (citation omitted).  "When the plaintiff

19   offers direct evidence of discriminatory motive, a triable issue as to the actual motivation

20   of the employer is created even if the evidence is not substantial. . . .  Direct evidence is

21   evidence, which, if believed, proves the fact of discriminatory animus without inference

22   or presumption."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998).

23   "[W]here direct evidence is unavailable, however, the plaintiff may come forward with

24   circumstantial evidence . . . to show that the employer's proffered motives were not the

25   actual motives because they are inconsistent or otherwise not believable.  Such evidence .

26   . . must be 'specific' and 'substantial' in order to create a triable issue with respect to

27   whether the employer intended to discriminate on the basis of [a prohibited ground]."  *Id.*

28   at 1222.  At all times, although the burden shifts between the parties, the ultimate burden

of persuasion remains with the plaintiff.  *St. Mary's Honor Ctr.*, 509 U.S. at 511.

### 1.    *Prima facie* case

In the context of a disparate treatment claim based on circumstantial evidence of racial discrimination, *McDonnell Douglas* sets out a framework that, if met, establishes a *prima facie* showing of unlawful discrimination.  Plaintiff must show that "(1) she belongs to a protected class, (2) she was performing according to her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) other employees with qualifications similar to her own were treated more favorably." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 640 n.5 (9th Cir. 2003) (*citing McDonnell Douglas*, 411 U.S. at 802)).  "The requisite degree of proof necessary to establish a *prima facie* case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence."  *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).  SLMC challenges Shaninga's ability to meet elements (2), (3), and (4).

### a.    Shaninga's performance at SLMC and the ICU

Courts recognize that extensive disciplinary records suffice to show that an employee cannot meet her burden on the second prong of the *prime facie* framework. *See, e.g.*, *Orr v. Univ. Med. Ctr.*, 51 F. App'x 277, at *1 (9th Cir. 2002) (concluding that an employee's "lengthy disciplinary record is more than adequate evidence to show that she was not" performing her job satisfactorily); *Nganje v. CVS RX Servs., Inc.*, 2015 WL 4173269, at *9 (D. Ariz. July 10, 2015) (holding that due to numerous occasions of verbal and written counseling, complaints from customers and co-workers, and receiving a "needs improvement" evaluation, "no reasonable jury could conclude that [the employee] was performing her job satisfactorily . . . .").  Here, SLMC points to the verbal and written disciplinary actions Shaninga sustained during her 10-month employment with SLMC.  Specifically, Shaninga received at least five verbal or written disciplinary warnings or actions by the time SLMC terminated her employment in November 2013, although the majority of the actions focused on Shaninga's attendance issues and not

problems with her skills as a nurse.

In fact, during her ninety-day review on May 16, 2013, Maharaj and Scherger rated Shaninga "above average" in categories related to her substantive performance as a nurse in the telemetry department, and "satisfactory" in categories of attendance and attitude.   While her rating of "above average" substantive performance does not necessarily extend beyond May 2013, there are no complaints from supervisors, colleagues, or patients (besides the October 29, 2013 TPN error) in the evidentiary record to suggest otherwise.   And while there is evidence that Shaninga's attendance issues continued beyond May 2013 that evidence does not prevent Shaninga from establishing this prong of her *prima face* case.

### b.    Adverse employment action

SLMC contends that its decision to terminate Shaninga's employment on November 4, 2013 constitutes the only adverse employment action relevant to her Title VII disparate treatment claim.   Shaninga raises no argument to the contrary in her response brief; accordingly, the point is conceded.

### c.    Similarly situated employees

The Ninth Circuit recognizes that courts "generally analyze an employer's reasons for why employees are not similarly situated at the pretext stage of *McDonnell Douglas*, not the *prima facie* stage."   *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1159 (9th Cir. 2010).   And although the analysis is relevant to both the *prima facie* and pretext part of the analysis, the two inquiries must remain distinct and separate.   *Id.* at 1158 (citation omitted).   This is so because the two stages require different burdens of proof where the burden at the *prima facie* stage is much less than at the pretext stage.   *Id.* (citation omitted).   Nevertheless, Shaninga alleges, for example, that SLMC did not reprimand the non-black charge nurse who was also involved in the October 29, 2013 TPN incident, while SLMC terminated Shaninga.   Consequently, because "[t]he *prima facie* case method established in *McDonnell Douglas* was 'never intended to be rigid, mechanized, or ritualistic," *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983),

but has rather been described as "not onerous," *Hawn*, 615 F.3d at 1158 (citation omitted), Shaninga's showing meets her burden and establishes a *prima facie* case of race based disparate treatment.

### 2.   Pretext

Although Shaninga establishes a *prima facie* case of discrimination, summary judgment on her Title VII disparate treatment claim is appropriate since she fails to carry her ultimate burden of persuasion and overcome SLMC's legitimate non-discriminatory reason for terminating her employment: the October 29, 2013 TPN error.[7]   Shaninga, relying on circumstantial proof, must present "specific" and "substantial" evidence demonstrating that SLMC's proffered reason for her termination was pretext masking discriminatory intent or was otherwise not believable for some different reason.   *See Vasquez*, 349 F.3d at 642.

### a.   Similarly situated employees

"A showing that the [employer] treated [a] similarly situated employee[] outside [of the plaintiff employee's] protected class more favorably would be probative of pretext." *Id.* at 641.   While the comparator employee's role must not be identical, it must be similar "in all material respects." *Hawn*, 615 F.3d at 1157 (citation omitted).   Courts interpret this to mean that "individuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez*, 349 F.3d at 641.   "[W]hether two employees are similarly situated is ordinarily a question of fact." *Beck v. United Food & Commercial Workers Union Local 99*, 506 F.3d 874, 885 n.5 (9th Cir. 2007).

Shaninga cites various scenarios where she contends SLMC treated similarly situated SLMC employees more favorably than she.   Some of these incidents relate to access to training while others raise supposed disparate disciplinary treatment.   Since

---

[7] Shaninga states that SLMC "falsely accused" her of the TPN error.   Doc. 76 at 2. SLMC, however, put forth evidence that it learned of the TPN incident, corroborated the error with supporting documentation, interviewed Shaninga, and then determined that the TPN incident occurred and Shaninga should be terminated.   Shaninga does not argue that SLMC's belief cannot serve as the basis to terminate her employment.   Instead, Shaninga argues that regardless of the validity of the TPN incident, SLMC simply used it as pretext to cover its true racially motivated reasons for ending her employment.

SLMC's decision to terminate Shaninga for her actions on October 29, 2013 constitutes the only adverse employment action applicable here, that incident and its circumstantial facts form the basis for the comparison. As such, the only relevant comparators are those SLMC employees who allegedly received more favorable disciplinary treatment than Shaninga. Accordingly, she raises three possible comparators: Erick Fischer, Karla Rivas, and Lilian. None of these individuals are similarly situated to Shaninga.

Fischer, who is white, worked as a charge nurse in the ICU on October 29, 2013, the day of the TPN bag incident. Shaninga argues that Fischer started the TPN bag that he and Shaninga allowed to finish after the physician ordered it discontinued; yet SLMC only disciplined Shaninga. SLMC, however, fired Shaninga because she began a *second* TPN bag on the patient—separate from the bag Fischer started—despite knowing that the patient's physician had withdrawn the therapy and then she defaced the bag's label in an attempt to cover up her actions. In addition, by giving the TPN bag to the wrong patient, the original patient to whom the physician originally prescribed the TPN bag went without it. The egregiousness of Shaninga's error is not sufficiently comparable to Fischer's actions. *Vasquez*, 349 F.3d at 641 (holding that alleged comparator was not similarly situated because he "did not engage in problematic conduct of comparable seriousness to that of [the employee]."). Fischer is not a relevant comparator.

Rivas, who is Filipina, is a certified nursing assistant while Shaninga is a registered nurse. The Ninth Circuit recognizes that "[e]mployees in supervisor positions are generally deemed not to be similarly situation to lower level employees" due to the differences in responsibilities between the positions. *See id.* Moreover, both Shaninga and Rivas received the same disciplinary action except that Shaninga received it first; therefore, even assuming Rivas is a valid comparator, there is no disparate treatment established.

Shaninga also alleges that "[a]t least one other non-African-American St. Luke's nurse named Lilian actually gave the wrong medication to a patient with low blood pressure and she was not terminated even though the patient died." PSOF ¶ 157, Ex. 1

¶ 170.  Shaninga, however, provides no corroborating evidence of the incident (let alone the last name of the nurse); thus, while Lilian may be a comparator, the Court cannot make that determination on this record.  Shaninga, moreover, fails to raise a genuine dispute of material fact on the issue since she solely relies on her own conclusive testimony that such an incident occurred.  *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996) (The Ninth Circuit has refused to find a "genuine issue" where the only evidence presented is "uncorroborated and self-serving" testimony).

### b.    Other evidence of disparate treatment

Shaninga raises other instances where she argues SLMC favored non-black nurses with regard to training.  She also highlights an incident where she perceived racial animosity with respect to her name.  Even considering that evidence collectively, its fails to meet Shaninga's burden of demonstrating "specific" and "substantial" proof that SLMC's adverse employment action was truly motivated by Shaninga's race and not by her poor attendance record and ultimately her unsatisfactory work performance.

Shaninga presents incompetent evidence as to the alleged disparity in training.  Shaninga's evidence that other non-black nurses received more training than she did is not corroborated by any exhibits or declaration testimony besides Shaninga's own.  *See Kennedy*, 90 F.3d at 1481; PSOF ¶ 24, Ex. 1 ¶¶ 21–25.  And while Shaninga can testify to things to which she holds personal knowledge, her declaration fails to establish foundation for such conclusions.  *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001) (affirming the district court's decision finding no genuine dispute of material fact when the plaintiff's deposition testimony attempting to raise such an issue failed to show personal knowledge).  Shaninga does not contest that, in fact, she received at least 237 hours of training from SLMC, and she presents no evidence beyond her own testimony that over 200 hours of training is an overall lower number than that of her colleagues.

Finally, the remarks Shaninga received about her name are also insufficient to establish discrimination.  *See Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th

Cir. 1990).   The remarks came from a secretary and a surgeon in the telemetry department, neither of whom Shaninga alleges took part in or influenced SLMC's final decision to terminate her employment.  *See id.* (*citing Smith v. Firestone Tire & Rubber Co.*, 875 F.2d 1325, 1330 (7th Cir. 1989) (noting that stray "remarks, . . . when unrelated to the decisional process, are insufficient to demonstrate that the employer relied on illegitimate criteria, even when such statements are made by the decision maker in issue.")).   The stray remarks alleged here, therefore, do not show pretext.

Ultimately, the factual record provides neither "specific" nor "substantial' evidence of pretext; therefore, the Court grants SLMC's motion for summary judgment on Shaninga's Title VII disparate treatment claim.

**B.    Retaliation**

To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected activity; (2) the employer subjected her to adverse employment action as a result of the protected activity; and (3) there was a causal link between the protected activity and the employer's action.  *Bergene v. Salt River Project Agric. Imp. & Power Dist.*, 272 F.3d 1136, 1141–42 (9th Cir.2001).

**1.    Protected activity**

Protected activity, at its core, occurs when an employee "protest[s] or otherwise oppose[s] unlawful employment discrimination directed against employees protected by Title VII." *Moyo v. Gomez*, 40 F.3d 982, 984 (9th Cir. 1994).  The protest or opposition can take different forms such as filing a complaint with the EEOC or simply making an informal complaint to a supervisor; even complaints made for the protection of employees in a protected class for which the protestor does not identify will suffice.  *See Ray v. Henderson*, 217 F.3d 1234, 1240 n.3 (9th Cir. 2000) (citations omitted). Nonetheless, an employee's activity is protected if her conduct "refers to some practice by the employer that is allegedly unlawful" under Title VII.  *E.E.O.C. v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013 (9th Cir. 1983).   Shaninga alleges that she engaged in protected activity via her May 7, 13, and 15, 2013 emails, her June 26, 2013

email, and through other off-hand verbal complaints she made to Maharaj at times before June 26.  SLMC concedes that Shaninga's June 26, 2013 email constitutes protected activity, but argues that the other occurrences do not meet the standard of protected activity since "they do not mention alleged race discrimination or harassment."  Doc. 72 at 13.

Shaninga's May 7, 2013 email alleges racially derogatory comments and thus raises the specter of racial discrimination and falls within protected activity.  In the email, Shaninga states that she was told that a particular secretary "has problems with black people" after she requested that the secretary summon the on-call doctor and he rebuffed her request.  Doc. 72, Ex. 1, Ex. 121.  Maharaj, upon receiving Shaninga's email, could have reasonably concluded that Shaninga's complaint stemmed from her belief that her race bothered some SLMC employees.  This is especially true since Shaninga mentions the racially-charged comment in the first paragraph of the email.  *See cf. Bright v. Mercer Advisors Inc.*, 2011 WL 1539677, at *3 (D. Ariz. Apr. 20, 2011) (holding that it would be unreasonable to expect an employer to infer a complaint of racial discrimination from an employee's "complaints about short, rude or otherwise disrespectful emails directed at [the employee's] department, which [were] not based on unlawful unemployment practices proscribed by Title VII . . . .").  Accordingly, a genuine dispute of fact exists as to whether Shaninga's act of sending the May 7, 2013 email can be categorized as protected activity within the reach of her Title VII retaliation claim.

Because none of the other May emails either allude to or mention race discrimination (nor any other unlawful discrimination), they are not protected; moreover, Shaninga's alleged off-hand comments to Maharaj also fail since Shaninga only vaguely remembers their existence, otherwise they are undocumented and Maharaj directly rebuts their occurrence via sworn declaration testimony.  Accordingly, Shaninga's May 7 and June 26 emails constitute the only protected activity.

### 2.    Adverse employment action

"Title VII's substantive provision and its antiretaliation provision are not

coterminous.   The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  Although broader in scope, to be actionable, "the challenged action [must be] materially adverse, which in this context means it well might . . . dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal quotation marks and citations omitted).   Material adversity serves to "separate significant from trivial harms," since Title VII "does not set forth a general civility code for the American workplace." *Id.* (internal quotation marks and citation omitted).  Trivial harms include "petty slights, minor annoyances, and simple lack of good manners," actions that will normally not deter an employee from complaining to the EEOC, the courts, or its employer about acts of discrimination. *Id.* (citation omitted).  Nonetheless, the Supreme Court employed broad language so as to not foreclose what may be a trivial harm in one circumstance from being a significant harm in another. *Id.* "Context matters." *Id.*

SLMC agrees that Smith's November 4, 2013 decision to terminate Shaninga equates to an adverse employment action within the standard espoused in *White*; however, SLMC contends that the litany of other alleged bad acts do not.  As a practical matter the adverse action must occur after Shaninga engaged in protected activity, thus after May 7.

Shaninga argues that after her May 7, 2013 email, she experienced an uptick in scheduling push-backs and shift cancellations at the hands of Smith.  Doc. 76 at 5–6; *see* PSOF ¶ 109, Ex. 1 ¶¶ 75, 84–85, 123–124.  The question is not whether Smith's alleged efforts to alter Shaninga's schedule or cancel her shifts materially affected Shaninga's conditions of employment; rather, the Court must determine whether "a reasonable person in the plaintiff's position, considering all the circumstances" would be dissuaded from exercising her right to access Title VII's "remedial mechanisms[,]" because of these actions. *Id.* at 68, 71 (internal quotation marks and citations omitted).  Thus, although Shaninga in fact emailed Maharaj on June 26, 2013 seeking redress for perceived

discrimination after SLMC allegedly engaged in adverse employment actions, the Supreme Court requires an objective "reasonable employee" standard ignoring "a plaintiff's unusual subjective feelings." *Id.* at 68–69. Through that lens, Shaninga raises a genuine dispute of material fact over whether her post-May 7, 2013 shift push-backs and cancellations constitute an adverse employment action.

Shaninga also alludes to what she describes as "overloads" in her assignments as a form of retaliation. Shaninga's fails, however, to support her argument with corroborating evidence. Without any proof that Smith, or some other SLMC employee, acted to overburden Shaninga's schedule with work outside the ordinary scope and/or burden of that of a comparable nurse, Shaninga fails to raise a dispute of fact on the issue.

Shaninga finally argues that SLMC's delayed reprimand of Rivas constitutes an adverse employment action. Under the *White* standard, however, the delayed admonishment of a third-party does not threaten a reasonable employee's likelihood to seek Title VII redress since the conduct does not threaten the employee's employment status. That is to say Rivas' belated reprimand does not affect Shaninga's likelihood of continued employment and income at SLMC; as such, it would be unreasonable for that incident to dissuade Shaninga from reporting issues of discrimination.

Accordingly, Shaninga suffered two adverse employment actions: her November 4, 2013 termination, and her collective post-May 7, 2013 schedule changes and shift cancellations.

### 3. Causation

"Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). The "but-for causation" requirement has created a pre- and post-*Nassar* standard.

"Under the pre-*Nassar* 'motivating factor' test, evidence of knowledge and

1    proximity in time, together, could have been sufficient for the Court to find a disputed

2    issue of fact on causation." *Drottz v. Park Electrochemical Corp.*, 2013 WL 6157858, at

3    *15 (D. Ariz. Nov. 25, 2013) (citation omitted); *see Ray*, 217 F.3d at 1244 (a causal link

4    may be inferred from proximity in time).  Post-*Nassar*, however, "while knowledge and

5    proximity in time certainly remain relevant when inferring but-for causation," they

6    cannot form the sole basis on which an employee may satisfy his or her *prima facie*

7    burden.  *Drottz*, 2013 WL 6157858, at *15.  As the *Nassar* Court warned, plaintiffs are

8    filing retaliation claims with "ever-increasing frequency."  *Nassar*, 133 S. Ct. at 2531.

9    Accordingly, the stronger "but-for causation" standard serves to close the door on

10   employees seeking to file even more frivolous retaliation claims by disallowing an

11   employee, who perceives his or her own impending termination, to "shield against [those]

12   imminent consequences" by pursuing some form of protected activity.  *Id.* at 2531–32;

13   *Drottz*, 2013 WL 6157858, at *15; *see also Brooks v. City of San Mateo*, 229 F.3d 917,

14   917 (9th Cir. 2000) (recognizing a concern that "employers will be paralyzed into

15   inaction once an employee has lodged a complaint under Title VII, making such a

16   complaint tantamount to a 'get out of jail free' card for employees engaged in job

17   misconduct").

18          Shaninga relies only on evidence of knowledge and temporal proximity to prove

19   causation.  Doc. 76 at 5–6.  Indeed, the record supports, crediting discrepancies in

20   Shaninga's favor, *Bodett*, 366 F.3d at 740, that Thompson, Smith, and Maharaj knew of

21   Shaninga's May 7 and June 26, 2013 emails.  And the schedule changes, shift

22   cancellations, and termination decision—all of which Shaninga argues Smith orchestrated

23   in retaliation to her complaints—occurred a few days to a few months after her May 7

24   and June 26 emails.  Nevertheless, without other evidence demonstrating that SLMC's

25   actions, and particularly Smith's actions, would not have occurred in the absence of

26   Shaninga's May 7 or June 26 emails, her allegations fit squarely within *Nassar's*

27   proscription.  *See Nassar*, 133 S. Ct. at 2533.  In the end, it takes more than allegations of

28   knowledge and temporal proximity to demonstrate but-for causation in a Title VII

1    retaliation claim.

2        Accordingly, Shaninga does not establish a genuine dispute of material fact on

3    but-for causation under the *Nassar* standard.  Thus, the Court grants SLMC's motion for

4    summary judgment on the cause of action.

5        **C.    Hostile Work Environment**

6        To establish a *prima facie* hostile work environment claim under Title VII,

7    Shaninga "must raise a triable issue of fact as to whether (1) she was 'subjected to verbal

8    or physical conduct' because of her race, (2) 'the conduct was unwelcome,' and (3) 'the

9    conduct was sufficiently severe or pervasive to alter the conditions of [Shaninga's]

10   employment and create an abusive work environment.'"  *Manatt v. Bank of Am., NA*, 339

11   F.3d 792, 798 (9th Cir. 2003) (citation omitted).  Shaninga must "show that the work

12   environment was both subjectively and objectively hostile."  *McGinest v. GTE Serv.

13   Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004) (citation omitted).

14       As to objective hostility, courts keep in mind that Title VII, again, is not a "general

15   civility code," therefore, "simple teasing, offhand comments, and isolated incidents

16   (unless extremely serious) will not amount to discriminatory changes in the terms and

17   conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

18   (internal quotation marks and citations omitted).  On the other hand, diagnosable

19   "psychological injury" is unnecessary as well.  *McGinest v. GTE Serv. Corp.*, 360 F.3d

20   1103, 1113 (9th Cir. 2004) (internal quotation marks and citations omitted).  Rather, "[i]t

21   is enough if such hostile conduct pollutes the victim's workplace, making it more

22   difficult for her to do her job, to take pride in her work, and to desire to stay on in her

23   position."  *Id.*   Other factors courts consider are the "frequency of discriminatory

24   conduct; its severity; whether it is physically threatening or humiliating, or a mere

25   offensive utterance; and whether it unreasonably interferes with an employee's work

26   performance."  *Nichols v. Azteca Restaurant Enters., Inc.*, 256 F.3d 864, 872 (9th Cir.

27   2001) (citation omitted).  Finally, objective hostility is determined "from the perspective

28   of a reasonable person belonging to the racial . . . group of the plaintiff."  *McGinest*, 360

F.3d at 1115 (footnote omitted).

In attempting to prove the existence of a hostile work environment, Shaninga relies on much of the same evidence used to form the basis of her disparate treatment claim.  In her response brief, Shaninga highlights the "disproportionate discipline levied at a member of a protective class [*i.e.*, Shaninga], when compared to those not in the protected class . . . that she was erratically scheduled . . . and questionably disciplined . . . .  She was removed from the schedule . . . for an expired medical test . . . .  Her disciplinary issues were also 'stacked' in an effort to make them seem more compelling. . . . [and finally] the complete failure of HR to contact [Shaninga] in any way after receiving her complaint of racial discrimination and harassment."   Doc. 76 at 9.  Shaninga's May 7, 2013 email raises the only alleged incident of racially based verbal harassment:  when an individual told Shaninga that a certain secretary "has problems with black people."  Her May 7 email also notes that "[o]ne time [she] could hear two staff members ridiculing" her for her English language skills.  Additionally, Shaninga references an incident where a secretary refused to call Shaninga "Debbie," the name on her badge, since the secretary's name was also "Debbie."  Finally, her June 26, 2013 raises racial discrimination in general terms, but does not espouse any specific incidence of racially motivated disparaging conduct.

Shaninga's testimony and complaints to SLMC establish subjective hostility.  *See McGinest*, 360 F.3d at 1113.  In fact, Shaninga espoused on multiple occasions a sentiment reflective of a hostile work environment.  In early May, Shaninga requested time off since she felt uncomfortable around her co-workers, whom she stated were "making it impossible to perform the essential duties of the job."  Doc. 72, Ex. C ¶ 14, Ex. 5.  And soon after she requested additional time off to "clear her name."  Doc. 72, Ex. C ¶ 18, Ex. 9; Doc. 72, Ex. C ¶ 19, Ex. 10.  She reinforced these feelings in her May 7 and June 26, 2013 emails.  Nevertheless, even though Shaninga subjectively perceived and experienced an abusive work environment, the facts fail to support an objective finding of hostility.

1   "Repeated derogatory or humiliating statements . . . can constitute a hostile work

2   environment[.]"  *Ray*, 217 F.3d at 1245.  Moreover, "[r]acially motivated comments or

3   actions may appear innocent or only mildly offensive to one who is not a member of the

4   targeted group, but in reality be intolerably abusive or threatening when understood from

5   the perspective of a plaintiff who is a member of the targeted group."  *McGinest*, 360

6   F.3d at 1116.  Nonetheless, "[n]ot every insult or harassing comment will constitute a

7   hostile work environment."  *Ray*, 217 F.3d at 1245.  Here, Shaninga cites to three

8   allegedly racially charged incidents that she experienced while at SLMC:  the comment

9   about the secretary's attitude towards black people, the comment about Shaninga's

10  English skills, and the colloquy over Shaninga's name.  None of these incidents, alone or

11  collectively, establish the existence of a hostile work environment.  Without evidence of

12  greater frequency, severity, or animus, the comments, while clearly "offensive

13  utterance[s,]" do not rise to the level of "physically threatening or humiliating" conduct

14  that objectively "pollutes" the workplace.  *Nichols*, 256 F.3d at 872; *Steiner v. Showboat

15  Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994); *but see McGinest*, 360 F.3d at 1115–

16  1118 (holding that an employee's hostile work environment claim survives summary

17  judgment when he "presented evidence that over the past ten to fifteen years several

18  racial incidents occurred each year, ranging in severity from being called racially

19  derogatory names to experiencing a potentially life-threatening accident.").  Instead they

20  qualify as "offhand comments[] and isolated incidents," *Faragher*, 524 U.S. at 788, in

21  other words, stray remarks, and "[s]tray remarks are insufficient to establish

22  discrimination."  *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990)

23  (internal quotation marks omitted); *see also Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705

24  (9th Cir. 1993) (discriminatory remark "uttered in an ambivalent manner" and "not tied

25  directly" to employment decision was at best "weak circumstantial evidence of

26  discriminatory animus" and insufficient to defeat summary judgment).

27   Additionally, Shaninga fails to connect the other conduct she argues creates a

28  hostile work environment to racial animus, and further fails to show that it is severe or

pervasive enough to create an abusive working environment.  At worst, Shaninga alleges that SLMC subjected her to disparate disciplinary treatment compared to a non-black CRA involved in the same misconduct; however, the treatment alleged occurred only once and the other individual eventually received a written warning like Shaninga. Shaninga also focuses on SLMC's failure to interview her with regard to her June 26, 2013 letter, characterizing that decision as "the most hostile event of all . . . ."  Doc. 76 at 9.  Notwithstanding whether or not SLMC should have interviewed Shaninga in the course of its investigation into her race discrimination claims,[8] Shaninga does not present evidence raising a dispute of fact as to how SLMC's failure to do so infected her work environment with interfering hostility.  To be sure, Shaninga proclaims in her briefing that SLMC's failure to interview her indeed altered her working conditions, yet that only satisfies the subjective part of the test; evidence of that alleged alteration is needed to meet the objective standard, and she provides none.[9]  Finally, other issues like her erratic schedule, cancelled shifts, and inability to attend some trainings, while inconvenient and frustrating, do not amount to conduct that is objectively hostile.  *See Brooks*, 229 F.3d at 927 (9th Cir. 2000) ("[N]ot all workplace conduct that may be described as harassment affects a term, condition, or privilege of employment within the meaning of Title VII.").

Shaninga argues that this is a close case, and as such "it is more appropriate to leave the assessment to the fact-finder than for the court to decide the case on summary judgment."  *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1096 (9th Cir. 2008).  This is not a close case.  The Court considers Shaninga's hostile work environment claim "in light of all the circumstances . . . ."  *Nichols*, 256 F.3d at 872 (citation omitted).  And although Shaninga subjectively perceived SLMC's treatment of her as racially motivated and hostile, the evidence of racial animus and "severe or pervasive" harassment is simply

---

[8] Shaninga presents no SLMC policy or guideline imposing on it the duty to seek more information from an employee who raises a complaint of unlawful discrimination beyond the employee's original grievance.

[9] In fact, Maharaj testified that she tried to meet with Shaninga to discuss SLMC's investigation into her complaint of discrimination and its findings but Shaninga declined and instead insisted that the results be put into a letter.  Doc. 72, Ex. C ¶ 24, Ex. 14.

missing from the record.  Accordingly, the Court grants summary judgment to SLMC on Shaninga's claim of a hostile work environment based on racial harassment.

## CONCLUSION

For the foregoing reasons, the Court grants SLMC's motion for summary judgment on Shaninga's Title VII, ACRA, and § 1981 claims.

**IT IS HEREBY ORDERED** that SLMC's motion for summary judgment (Doc. 72) is **GRANTED**.  The Clerk of Court is directed to enter judgment accordingly.

Dated this 11th day of April, 2016.

Honorable G. Murray Snow
United States District Judge